UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKUS DEAN FELKINS, | No. 2:22-cv-1652-KJM-KJN |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 12, 15.) |
| Defendant. | |

Plaintiff seeks judicial review of a final decision by the Commissioner of Social Security denying his application for Disability Insurance Benefits under Title II.[1] In his motion for summary judgment, plaintiff contends the Administrative Law Judge ("ALJ") erred in discounting the medical evidence, medical opinions, and symptom testimony regarding plaintiff's vision and knee impairments. Plaintiff requests this court remand for benefits. (ECF Nos. 12, 16.) The Commissioner requests affirmance, arguing substantial evidence supports the ALJ's findings regarding the eye and knee impairments and the decision is free from legal error. (ECF No. 14.)

For the reasons stated below, the court RECOMMENDS plaintiff's motion be denied, the Commissioner's cross-motion be granted, and the case be affirmed.

---

[1] This action was referred to the undersigned pursuant to 28 U.S.C. § 636 and Local Rule 302(c)(15) for the entry of findings and recommendations. See Local Rule 304.

1

## I.  RELEVANT LAW

The Social Security Act provides for benefits for qualifying individuals unable to "engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a). An ALJ is to follow a five-step sequence when evaluating an applicant's eligibility, summarized as follows:

> **Step one**: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> **Step two**: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> **Step three**: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> **Step four**: Is the claimant capable of performing past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
> **Step five**: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995); see also 20 C.F.R. § 404.1520(a)(4). The burden of proof rests with the claimant through step four, and with the Commissioner at step five. Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).

A district court may reverse the agency's decision only if the ALJ's decision "contains legal error or is not supported by substantial evidence." Id. at 1154. Substantial evidence is more than a mere scintilla, but less than a preponderance, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The court reviews the record as a whole, including evidence that both supports and detracts from the ALJ's conclusion. Luther v. Berryhill, 891 F.3d 872, 875 (9th Cir. 2018). However, the court may review only the reasons provided by the ALJ in the decision, and may not affirm on a ground upon which the ALJ did not rely. Id. "[T]he ALJ must provide sufficient reasoning that allows [the court] to perform [a] review." Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020).

The ALJ "is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Ford, 950 F.3d at 1154. Where evidence is susceptible to more than one rational interpretation, the ALJ's conclusion "must be upheld." Id. Further, the court may not reverse the ALJ's decision on account of harmless error. Id.

2

## II. BACKGROUND AND ALJ'S FIVE–STEP ANALYSIS

In June of 2019, plaintiff applied for Disability Insurance Benefits, alleging disability due to "blindness, numbness in hands, head and neck pain." (See Administrative Transcript ("AT") 114 and 216, electronically filed at ECF No. 6.) Plaintiff's application was twice denied, and he sought review with an ALJ. (See AT 114, 120, 126.) The ALJ held a hearing on May 12, 2021, where plaintiff testified about his symptoms and a Vocational Expert ("VE") testified regarding jobs for someone with certain hypothetical limitations. (See AT 36-84.)

On May 26, 2021, the ALJ issued a decision denying plaintiff's claim. (AT 20-31.) At step one, the ALJ found plaintiff had not engaged in substantial gainful activity between his alleged onset date of October 11, 2012, through his date last insured ("DLI") of December 31, 2013. (AT 22.) At step two, the ALJ noted plaintiff had the following severe impairments: post-concussion syndrome; cervical and lumbar degenerative disc disease with radiculopathy; right knee degenerative joint disease with meniscal tear and osteoarthritis of the patellofemoral and medial femorotibial joints; and bilateral carpal tunnel syndrome. (AT 23.) Relevant here, the ALJ found that while later treatment notes indicated plaintiff had developed severe visual defects, there was no evidence to support a finding his vision was severe between 2012 and 2013. (Id.) Specifically, the ALJ found:

> Emergency department records from November 2012 characterize [plaintiff's] vision problem as resolved. [CT] of [plaintiff's] brain was negative for cerebral injury. [Plaintiff] did not complain of visual disturbance at his December 2012 or January 2013 treatment visit. At [plaintiff's] August 2013 [ER] visit, [plaintiff's] pupils were equal and reactive and [he] did not complain of vision problems. November 2013 imaging showed no metallic artifacts in [plaintiff's] orbits. The record does not show complaints of blurry vision until July 2015, with no objective visual findings at this time. After the date last insured, [plaintiff] again complained of vision problems in October 2017. In March 2019, some five years past the date last insured, [plaintiff] has 20/200 vision in the left eye, but his right eye vision was within normal limits at 20/40.

(AT 23 (citations omitted).) The ALJ concluded plaintiff "[had] not established blindness prior to the [DLI] so as to be evaluated under a blind DLI, and treatment notes prior to the DLI are unsupportive of the claimant having a severe visual impairment." (Id.) The ALJ also noted that the VE stated plaintiff could still do the jobs at step 5 if "monocular vision" was found. (Id.)

At step three, the ALJ determined plaintiff was not disabled under the listings, rejecting (among other things) Listing 2.02 for Loss of Central Visual Acuity. (AT 24, citing 20 C.F.R. Part 404, Subpart P, Appendix 1). The ALJ also found a lack of evidence to support "need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands. (Id., citing Listings 1.15(D)(1), 1.16(D)(1), and 1.18(D)(1)). The ALJ then determined plaintiff had the Residual Functional Capacity ("RFC") in 2012-13 to perform light work as under 20 C.F.R. § 404.1567(b) with the following additional limitations:

> [Plaintiff] can frequently balance, climb stairs and ramps and stoop, and can occasionally crouch, kneel and crawl; but cannot climb ladders, ropes or scaffolds[;] can frequently push, pull, and reach overhead bilaterally[;] can frequently finger, handle and feel bilaterally[;] cannot have exposure to hazards, including unprotected heights and moving machinery.

(AT 25.) In fashioning this RFC, the ALJ stated she considered plaintiff's symptoms, the medical evidence, and professional medical opinions in the record. (Id.) Relevant here, the ALJ noted plaintiff's testimony about his physical state in in 2012-13, including his trouble driving and cutting trees, reading, and performing other daily activities. (AT 26.) However, the ALJ found the intensity of his symptoms did not align with the rest of the evidence from the relevant time period, including exams and scans after a 2012 injury when a tree branch struck him in the head, and medical reports demonstrating normal gait before and after the knee injury. (Id.) The ALJ noted plaintiff's concussion symptoms appeared to resolve with ibuprofen a couple months after the head injury, and plaintiff did not complain about vision problems until July of 2015 (with no exam of his vision occurring until 2019). (Id.) Finally, as is relevant here, the ALJ found "unpersuasive" the opinions about plaintiff's vision from Neurologist Dr. Shalom (December 2018), Ophthalmologist Dr. Woods (three opinions in 2019); and Ophthalmologist Dr. Edington (July 2020); as well as the opinion about his knee from Dr. Brown (July 2014). (AT 27-28.) The ALJ found these opinions concerned plaintiff's condition as it was in 2019-21 and inconsistent with the evidence from the 2012-13 period. (Id.) Conversely, the ALJ found the opinion from state-agency physician Dr. Wong, which aligned with the RFC, to be persuasive as supported by rationale and consistent with the record. (AT 28.)

Based on the RFC and the VE's testimony, the ALJ concluded that though plaintiff was incapable of performing any past relevant work, there were multiple jobs in the national economy he could perform, including Office Helper, Ticket Taker, Price Marker, Packager, and Mailroom Clerk.  (AT 29-30.)  Thus, the ALJ determined plaintiff was not disabled for the relevant period.  (AT 31.)

The Appeals Council denied plaintiff's appeal.  (AT 1-7.)  Thereafter, plaintiff filed this action requesting review of the ALJ's decision, and the parties each moved for summary judgment.  (ECF Nos. 1, 12, 15, 16.)

### III.    DISCUSSION

Plaintiff contends there are multiple reasons why the ALJ erred in finding him not disabled.  Regarding his vision impairment, plaintiff contends his testimony and two doctors' opinions were improperly discounted and supporting evidence was either mischaracterized or ignored.  Plaintiff argues this led to errors at step two and in the fashioning of the RFC, and these errors were harmful because the VE indicated a person with the more severe conditions would not have been able to work.  Regarding his knee impairment, plaintiff contends the ALJ ignored and mischaracterized the evidence showing a disabling condition from just after plaintiff's DLI.

The Commissioner contends the ALJ properly rejected plaintiff's testimony due to the medical evidence in the record from 2012-13 and beyond, as well as plaintiff's failure to seek treatment for his eyes and conservative treatment for his knee.  The Commissioner notes Dr. Edington himself expressed doubts about the state of plaintiff's vision in 2012-13, and contends the ALJ did acknowledge imaging evidence of plaintiff's knee from the relevant period but relied on more persuasive evidence showing normal gait and a lack of an assistive device in 2012-13.

#### Legal Standards – Date Last Insured

Under the regulations, in order to obtain disability benefits, a claimant must demonstrate disability prior to her last insured date.  See 42 U.S.C. § 423(c); 20 C.F.R. § 404.1520.  Evidence relating to periods after the date last insured are less probative of a plaintiff's claim for disability, particularly where such evidence does not appear to concern the insured period.  See, e.g., Melynda G. v. Kijakazi, 2022 U.S. Dist. LEXIS 57633, at *12 (C.D. Cal. Mar. 29, 2022)

(affirming the ALJ's assignment of little weight to a physician's opinion because it was dated more than two years after plaintiff's date last insured and did not relate to the disability period at issue); see also, e.g., Watkins v. Astrue, 357 Fed. App'x 784, 786 (9th Cir. 2009) (affirming rejection of treating physician's opinion offered after claimant's insured status expired where the "questionnaire [was] written in the present tense" and "made no indication" it was retroactive).

**Legal Standards – Step Two Severe and Non-severe Impairments**

Under the Commissioner's regulations, an impairment or combination of impairments is deemed to be severe at step two if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (internal citations and quotation marks omitted). The step two assessment is a "de minimus screening to dispose of groundless claims." Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001).

**Legal Standards – Medical Opinions and Persuasiveness under the 2017 Regulations**

Plaintiff proffers arguments about the ALJ's treatment of the medical and state-agency opinions under a framework of "treating" and "non-examining." See, e.g., Carmickle v. Comm'r, 533 F.3d 1155, 1164 (9th Cir. 2008) (an ALJ was to give more weight to "those physicians with the most significant clinical relationship with the plaintiff[.]"). However, the regulations that apply to plaintiff's case have done away with some of those distinctions. See 20 C.F.R. § 404.1520c(a) (noting that for applications filed on or after March 27, 2017, the new regulations regarding medical opinions provide that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) ("PAMF") [i.e., state-agency medical consultants], including those from [plaintiff's] medical sources.").

Under the post-2017 regulations, an ALJ is to frame her evaluation of medical opinions and PAMFs by considering their "persuasiveness." § 404.1520c(a). In determining how "persuasive" the opinion of a medical source or PAMF is, an ALJ must consider the following

factors: supportability, consistency, treatment relationship, specialization, and "other factors." § 404.1520c(b), (c)(1)-(5). Important here, the ALJ is required to "explain how he considered" the supportability and consistency factors, as they are "the most important factors." § 404.1520c(b)(2).

**Legal Standards – Cherry Picking and Discussion of Evidence in the Record**

The Ninth Circuit has held that ALJ's may not cherry-pick around probative evidence. See Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001) (reversing where the ALJ "selectively relied on some entries [in the plaintiff's treatment records] and ignored the many others that indicated continued, severe impairment."). This law appears still to be good law in this circuit, despite the revised regulations. However, this principle is often in balance with another: that "an ALJ need not discuss all evidence presented to [them]." Kilpatrick v. Kijakazi, 35 F.4th 1187, 1193 (9th Cir. 2022). The court interprets this tension in the caselaw to indicate that where an ALJ provides "sufficient reasoning [allowing for] review," Lambert, 980 F.3d at 1277, including a discussion of most evidence probative of the plaintiff's claim, Luther, 891 F.3d at 875, and this reasoning "may reasonably be discerned," Molina, 674 F.3d at 1121, the court's conclusion should be that the decision is upheld as "susceptible to more than one rational interpretation," Ford, 950 F.3d at 1154; see also Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) ("[A] reviewing court [is] not deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion."). However, if the ALJ appears to be ignoring key segments of plaintiff's evidence regarding a particular condition, and it appears the ALJ does so to arrive at a predetermined outcome, the court will consider this to be inappropriate cherry-picking and order a reversal for further proceedings. Holohan, 246 F.3d at 1207.

**Legal Standards – Subjective Symptom Testimony**

A claimant's statements of subjective symptoms alone are insufficient grounds to establish disability. 20 C.F.R § 404.1529(a). If an ALJ was required to believe every allegation of pain or impairment, disability benefits would run afoul of the Social Security Act and its purpose. See Treichler v. Comm'r, 775 F.3d 1090, 1106 (9th Cir. 2014). In evaluating the extent to which an ALJ must credit the claimant's report of their symptoms, the Ninth Circuit has stated:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof.
> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (quoting Garrison, 759 F.3d at 1014-15).

The ALJ's reasons for discounting or rejecting a claimant's subjective symptom testimony must be "sufficiently specific to allow a reviewing court to conclude the adjudicator . . . did not arbitrarily discredit a claimant's testimony." Brown-Hunter v. Colvin, 806 F.3d 487, 483 (9th Cir. 2015) (quoting Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991)).  Examples of "specific, clear and convincing reasons" for discounting or rejecting a claimant's subjective symptom testimony include: prescription of conservative treatment, inconsistencies between a claimant's testimony and conduct (including daily activities), and whether the alleged symptoms are consistent with the medical evidence of record.  See Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); see also Fair v. Bowen, 885 F.2d 597, 604 n. 5 (9th Cir. 1989) (explaining that the ALJ may employ ordinary techniques of credibility evaluation and may take into account prior inconsistent statements).  A lack of corroborating, objective medical evidence alone is insufficient grounds for an ALJ to discount a claimant's subjective symptoms; however, it is a factor the ALJ may consider.  See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R § 404.1529(c)(2)).

**Analysis**

The court begins by addressing a subset of plaintiff's arguments.  First, plaintiff argues in his reply brief that the assertions made in his statement of undisputed facts were not contested by the Commissioner in a separate statement and so should be taken as correct and undisputed. (ECF No. 16 at 7-8.)  However, under the court's local rules, parties submitting motions in administrative cases "need not file a statement of undisputed facts or a statement of disputed

8

facts." Local Rule 261. Thus, the court focuses on the assertions in briefing and citations to the administrative transcript.

Second, concerning the ALJ's treatment of the medical opinions in this case, plaintiff proffers arguments that the ALJ failed to offer specific and legitimate reasons for discounting the treating and examining physicians' opinions in favor of the non-examining state agency physician Dr. Wong. However, the Ninth Circuit has held that under the new regulations, this framework is no longer applicable. Woods v. Kijakazi, 32 F.4th 785, 792 (9th Cir. 2022) ("The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant."). As instructed by the new regulations and Woods, the court reviews the ALJ's decision to make sure she properly weighed each opinion for its persuasiveness, expressing her findings on how she considered the opinions' supportability and consistency. See 20 C.F.R. § 404.1520c (also noting no requirement to express findings on other factors, such as a physician's specialty, unless two opinions are otherwise "equally persuasive").

 1. Vision Impairment

Regarding plaintiff's allegations that he was disabled between 2012 and 2013 due to vision impairment, the ALJ's discussion is split across four parts of the decision. First, the ALJ took stock of the medical evidence in the record at step two, stating:

> While later treatment notes show the claimant to have severe visual deficits, the claimant's visual disturbance was non-severe prior to the date last insured. Emergency department records from November 2012 characterize the claimant's vision problem as resolved (Ex. 1F/7). Computerized tomography (CT) of the claimant's brain was negative for cerebral injury (Ex. 1F/11). The claimant did not complain of visual disturbance at his December 2012 or January 2013 treatment visit (Ex. 1F/14, 16). At the claimant's August 2013 emergency department visit, the claimant's pupils were equal and reactive and the claimant did not complain of vision problems (Ex. 2F/7). November 2013 imaging showed no metallic artifacts in the claimant's orbits (Ex. 2F/3). The record does not show complaints of blurry vision until July 2015, with no objective visual findings at this time (Ex. 3F/10). After the date last insured, the claimant again complained of vision problems in October 2017 (Ex. 4F/4, 10). In March 2019, some five years past the date last insured, the claimant has 20/200 vision in the left eye, but his right eye vision was within normal limits at 20/40 (Ex. 5F/2). The claimant has not established blindness prior to the date

> last insured (DLI) so as to be evaluated under a blind DLI, and treatment notes prior to the DLI are unsupportive of the claimant having a severe visual impairment. Moreover, the vocational expert testified that the jobs available to the claimant at step 5 would remain even if the claimant were limited to jobs requiring only monocular vision []. The claimant did not meet or equal any visual listing prior to the date last insured, including listing 2.02.

(AT 23.) Second, the ALJ summarized plaintiff's symptom testimony, noting his contention that during the relevant period he had trouble driving (but continued to drive through 2015), using tools to cut trees, reading instructions on boxes, doing laundry, shaving, and reading smaller print. (AT 26.) Third, the ALJ found plaintiff's allegations, while consistent with his current state, were inconsistent with his assertions to his medical providers, and the overall medical evidence, in 2012-13. (AT 27.) The ALJ stated: "Given the paucity of evidence of ongoing visual disturbance prior to the date last insured, visual restrictions were not incorporated into the residual functional capacity formulation[.]" (Id.) Fourth, the ALJ summarized the medical opinions on plaintiff's vision, as expressed by Drs. McKinney (October 2017 exam), Shalom (December 2018 exam), Woods (four opinions after 2019 exams), Edington (July 2020 exam), and Wong (September 2019 PAMF). (AT 27-29.) The ALJ's rationale in finding each doctors' opinion unpersuasive on plaintiff's visual impairment is the same (save Dr. Wong, who opined plaintiff could do light work and with whom the ALJ agreed): that while the opinions might be in line with plaintiff's condition in 2019-21, they are inconsistent with the medical evidence in the record from 2012-13. (See Id.) The ALJ cites the same medical evidence in each of these paragraphs as was cited at step two, as well as a record from 2014 where plaintiff reported to his medical providers "no vision changes" (AT 618), and one from 2012 recording his difficulty doing a finger-to-nose maneuver (AT 910). (See id.)

Plaintiff contends this assessment improperly discounts his symptom testimony, ignores evidence that plaintiff did not test well in 2012, and ignores the opinions from Dr. Woods and Dr. Edington (as well as the latter's deposition testimony) that plaintiff's eye condition would have been disabling in 2012 just as it was in 2019. Given this evidence, plaintiff contends the ALJ's decision is harmful error because the VE indicated a person with the more severe conditions would not have been able to do the light work ascribed in the RFC. Overall, the court disagrees.

Starting at step two, the undersigned agrees that some of the evidence cited by the ALJ in finding plaintiff's vision non-severe appears not to support the ALJ's conclusions. For example, the ALJ noted that in November 2012, ER records characterized plaintiff's vision impairments as "resolved," a CT scan was negative for cerebral injury, in August 2013 ER records showed equal, reactive pupils, and in November 2013 no metallic artifacts were found during an MRI. (AT 23.) However, Dr. Edington opined at his deposition that a condition such as convergence insufficiency may have taken months to appear and that an ER doctor "probably would not have been able to make [his] diagnosis." (AT 457.) Dr. Edington also opined plaintiff's visual impairment "would [not] be expected to show up on a CT [] scan." (AT 459; see also AT 460 ("Q: And as to the convergence insufficiency, would you expect any of the findings you made to have appeared in a brain CT taken a month or so after his injury? A: No, I would not.").) Further, even in 2019 when plaintiff's vision impairment appears severe, Dr. Edington found normal pupil exam results. (AT 346.) No other physician opined on why this evidence might support a conclusion of non-severity at step two, so the court cannot conclude the ALJ was correct in relying on this evidence.[2] Ford, 950 F.3d at 1154 (ambiguities are for the ALJ to resolve).

Disregarding these of the ALJ's findings, the question becomes: what relevant evidence did the ALJ cite to that properly supports her non-severity finding at step two regarding plaintiff's vision? From the ALJ's recounting, as well as the undersigned's review of the record, the answer appears to be a lack of evidence showing any vision impairment in 2012-13. As the ALJ noted, plaintiff did not complain of any visual disturbances in December of 2012, January of 2013, or

---

[2] It is unclear to the court what the correlation is between the "no metallic artifacts" finding and plaintiff's vision in 2013, as this medical record relates to an MRI of plaintiff's knee. However, this finding, and the ALJ's overall rationale, appears to track Dr. Edington's testimony concerning potential causes for plaintiff's vision impairment, including a correlation between the alleged neuropathy and the possible cause of metal poisoning, cerebral injury, and the like. Thus, the undersigned concludes the ALJ did consider Dr. Edington's deposition testimony. In other words, the court disagrees that the ALJ cherry picked around the deposition, despite the decision's lack of an explicit citation to the deposition transcript. Kilpatrick, 35 F.4th at 1193 (reminding that an ALJ need not discuss all evidence presented to them); Molina, 674 F.3d at 1121 (requiring affirmance where the ALJ's reasoning "may reasonably be discerned").

August of 2013. (AT 23, citing AT 529, 533, 547.) The first complaints from plaintiff about his vision do not come until 2015 and 2017, and the first exam results showing impaired vision did not come until 2019. (AT 23, citing AT 559, 565, 579.) When asked at the hearing why plaintiff did not complain in 2012, plaintiff's answer was essentially non-responsive. (AT 46, 57.) Dr. Edington opined that plaintiff's vision impairment would have shown up within months of the cause, and would not have progressively gotten worse. (AT 439 ("[The condition] would have been present within weeks to months after the -- whatever injury caused that neuropathy."); AT 458 ("If it got worse, it would be from something else. That is to say it's not progressive.").) Thus, his vision impairment would have manifested as a severe condition within months of his 2012 concussion and as Dr. Edington stated (see below), likely would have been apparent to plaintiff. Under this context, the ALJ did not err in rejecting plaintiff's symptom testimony due to a lack of medical evidence, plaintiff's inadequately explained failure to seek treatment, and his testimony that he went back to work soon after the concussion and continued to drive for years after the accident. Rollins, 261 F.3d at 857 (reminding that a lack of corroborating, objective medical evidence alone is insufficient grounds for an ALJ to discount a claimant's subjective symptoms; however, it is a factor the ALJ may consider); Tommasetti, 533 F.3d at 1040 (finding a "permissible inference" where the plaintiff failed to seek treatment despite alleging full disability, and proper use of "ordinary techniques of credibility evaluation" where the plaintiff gave vague answers about the disabling condition); see also Treichler, 775 F.3d at 1106 ("If an ALJ was required to believe every allegation of pain or impairment, disability benefits would run afoul of the Social Security Act and its purpose."); 20 C.F.R § 404.1529(a).

      Turning to the ALJ's resolution of the opinions from Drs. Edington and Woods, the undersigned again finds no error. It is not disputed that each made findings consistent with a severe vision impairment existing in 2019-20 after eye examinations at that time. However, the ALJ noted there was little to link these exam findings to plaintiff's vision as it existed during the insured period of 2012-13. (AT 28; see also AT 27 (noting the "paucity of evidence" from the 2012-13 period demonstrating any visual limitations).) In so concluding, the ALJ cites the same records as at step two, and the undersigned finds the ALJ's finding regarding an absence of

1  evidence to be a correct assessment of the record.  Given the ALJ's proper rejection of plaintiff's

2  symptom testimony and this absence of evidence, the undersigned finds no overall error in the

3  assessment of plaintiff's vision as it was in 2012, and no error in the conclusion that these

4  doctors' opinions were inconsistent with the medical evidence from that time.  Ford, 950 F.3d at

5  1148 (reminding the burden of proof rests with the claimant up through step four).

6       In so concluding, the undersigned rejects a specific subset of plaintiff's argument

7  regarding the ALJ's assessment of Dr. Edington's opinion.  It is true that Dr. Edington opined

8  plaintiff had severe visual limitations in 2020 and ultimately concluded that plaintiff would have

9  been similarly limited in 2012.  (See AT 352.)  The ALJ rejected Dr. Edington's causal link due

10  to its inconsistency with the medical records available at the time (as discussed above).  Plaintiff

11  appears to contend that without some countervailing opinion on Dr. Edington's specific assertion

12  regarding this causal link, the ALJ was required to accept Dr. Edington's conclusion as true, thus

13  finding plaintiff had a severe visual limitation in 2012-13.  However, an examination of Dr.

14  Edington's opinion (and associated deposition testimony) reveals that the doctor himself was not

15  as certain about his conclusion as plaintiff would have the court believe.

16       To wit, Dr. Edington stated that plaintiff's inability to converge in 2020 could have

17  resulted from a number of causes, including a congenital or acquired defect, stroke or other brain

18  injury, a history of optic neuritis, heavy metal poisoning, or blunt force trauma.  (AT 350.)  The

19  doctor noted the only explanation from the records before him was that this condition must have

20  resulted from plaintiff's 2012 concussion (hence his conclusion that plaintiff's vision was likely

21  impaired in 2012).  But Dr. Edington, like the ALJ, explicitly and repeatedly noted the dearth of

22  evidence and lack of plaintiff's complaints as "unusual," given that the injury occurred

23  approximately eight years prior to the doctor's evaluation and that plaintiff did not have "any eye

24  examination, evaluation or treatment until approximately seven years after the injury." (AT 351.)

25  Later in his opinion, Dr. Edington stated:

26          [Plaintiff] states that the visual impairment dates back to his injury
           in 2012.  It is not clear to this examiner why there was such a large
27          time gap between the injury in 2012 and follow-up eye
           examination.  This applicant has severe visual impairment and <u>in
28          the absence of evidence of other sources of injury</u>, I would attribute

> all of this visual impairment to the industrial injury of 10/11/2012 .
> . . .This opinion is supported by the fact that there is no indication
> of previous or subsequent visual impairment or injury to the visual
> system. It is further supported by the fact that the applicant's
> mechanism of injury, as well as objective findings are consistent
> with industrial causation.

(AT 352 (emphasis added).) Dr. Edington's answers in deposition were even more cautionary. (See AT 437 (noting that the case was unusual because the impairment "is not something that I would expect to be subtle . . ., [that] I would have expected to see a complaint to the doctors[,] an evaluation with some sort of an eye doctor somewhere in that period of time . . . . It's somewhat surprising that someone could have an accident which leaves him legally blind and it takes seven years before that issue was addressed."); AT 438 ("It -- it could be the type of thing that the person ignored. Again, that's a lot to ignore . . . . Maybe given my line of business, it's, you know, something that, if you're blind, you tend to notice that and tend to complain about it. And even though the applicant told me that it's been this way since the accident, I didn't get a clear explanation of -- of why that wasn't addressed earlier.").) Given the ambiguity in Dr. Edington's opinion, and given that his correlation was based on plaintiff's subjective reports, the ALJ did not err in finding any expressed correlation between plaintiff's vision in 2019 and 2012 to be inconsistent with the "paucity of evidence" in the case. Ford, 950 F.3d at 1154 (reminding that the ALJ's authority includes resolving ambiguities in the record); 20 C.F.R. § 404.1520c(b)(2) (requiring that the ALJ "explain how he considered" the supportability and consistency factors, as they are "the most important factors"); Fair, 885 F.2d at 604 (finding that a physician's opinion "premised to a large extent upon the claimant's own accounts" may be disregarded where those complaints have been "properly discounted").

    2. Knee Impairment

Regarding plaintiff's allegations that he was disabled between 2012 and 2013 due to a knee impairment, the ALJ found at step two that plaintiff had the severe condition of "right knee degenerative joint disease with meniscal tear and osteoarthritis of the patellofemoral and medial femorotibial joints." (AT 23.) The ALJ considered Listing 1.18 (abnormality of a major joint in any extremity), but rejected a finding of disability at step three due to a lack of evidence

demonstrating a "documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands . . . [or] a one-handed, hand held assistive device . . . ."  (AT 24.)  The ALJ also found plaintiff did not meet any listing related to his carpal tunnel syndrome or peripheral neuropathy, noting no evidence supporting an inability to "stand up from a seated position [or] balance while standing or walking . . . ."  (Id.)  The ALJ then assigned a light work RFC with the following additional restrictions (as related to plaintiff's knee impairment): "[He] can frequently balance, climb stairs and ramps and stoop; and can occasionally crouch, kneel and crawl; but cannot climb ladders, ropes, or scaffolds; . . . [and] cannot have exposure to . . . unprotected heights and moving machinery."  (AT 25.)

In so finding, the ALJ noted records showing "effusion and cartilage loss as well as a complete ACL tear and a partial tear of the medial meniscus" as well as "mild osteoarthritis and small joint effusion but no acute bony abnormality" after an MRI and x-rays in the days and months after the incident.  (Id., citing AT 544, 634.)  However, the rationale offered by the ALJ in not assigning more severe restrictions was that, though plaintiff injured his right leg in August of 2013, the longitudinal record showed plaintiff's gait was consistently found to be "normal" and no assistive device was noted or prescribed.  (See AT 26, citing AT 909; AT 28, citing AT 529, 535, 537 (ALJ's citations and records prior to the 2013 incident); AT 26, citing AT 547 (ER records just after the injury indicating plaintiff was "able to bear weight" and "walk fairly easily."); AT 26-28, citing AT 559, 565, 571, 604-08, 614, 618 (records from the years after the 2013 incident).)  Given these records, the ALJ found plaintiff's assertion that he had used a walking stick since 2013 (AT 27) and the more severe restrictions opined by Dr. McKinney, offered after an October 2017 exam (AT 569) and opined by Dr. Brown, offered after a July 2014 exam (AT 612), to be inconsistent.  (AT 27-28.)  Conversely, the ALJ found Dr. Wong's assessment in the PAMF largely consistent with these same records, adopting most of Dr. Wong's opined restrictions into the RFC.  (AT 28, citing AT 94-96.)  This is substantial evidence supporting the ALJ's decision.  Ford, 950 F.3d at 1154.

Plaintiff contends this assessment ignores and mischaracterizes the evidence concerning his knee.  Plaintiff points to the fact that Dr. Brown put plaintiff on state disability in July of 2014

15

and should "bear no weight on the right knee until after surgery due to [the] meniscal tear." (AT 612). Plaintiff also cites the records supporting his contention of a more severe knee impairment from August 2013 onward. (AT 605-09, 626-29.) However, the decision does not ignore the records, as the ALJ explicitly cited Dr. Brown's report and the lab reports demonstrating plaintiff's knee impairment was severe. Nor does the undersigned find the ALJ mischaracterized the record, as those same medical professionals who noted the severe impairment also explicitly noted plaintiff's normal gait and lack of an assistive device (either used or prescribed). The RFC is for the ALJ to craft, and the court cannot reweigh the evidence. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002) (noting that where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld).

## IV.   CONCLUSION

For these reasons, the ALJ did not err in assessing plaintiff's vision and knee impairments as they existed in 2012-13, nor in posing hypotheticals to the VE corresponding the RFC. Osenbrock v. Apfel, 240 F.3d 1157, 1164 (9th Cir. 2001) (finding no error "in failing to include [the] alleged impairments in the hypothetical question posed to the VE" because the allegations were rejected).

Beyond plaintiff's challenges, the court finds the ALJ's decision otherwise supported by substantial evidence in the record and free from legal error. Ford, 950 F.3d at 1148 (noting that a district court may reverse only if the ALJ's decision "contains legal error or is not supported by substantial evidence.") Accordingly, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's motion for summary judgment (ECF No. 28) be DENIED;
2. The Commissioner's cross-motion (ECF No. 31) be GRANTED;
3. The final decision of the Commissioner be AFFIRMED; and
4. The Clerk of Court be directed to CLOSE this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to

1  Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served
2  on all parties and filed with the court within fourteen (14) days after service of the objections.
3  The parties are advised that failure to file objections within the specified time may waive the right
4  to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998);
5  Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated: October 6, 2023

*/s/ Kendall J. Newman*
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

felk.1652